No. 59,414

Gerald W. Lightner, in his capacity as special administrator of the Estate of Jessie M. Lightner, deceased, *Appellant*, v. Centennial Life Insurance Company, a corporation; Lloyd Lightner and Vivian Lightner, in their capacity as co-administrators for the Estate of Dale R. Lightner, deceased; and Kansas Department of Revenue, *Appellees*.

(744 P.2d 840)

Opinion filed October 30, 1987.

*James J. McGannon*, of Regan & McGannon, of Wichita, argued the cause, and

*Patrick J. Regan* and *Jerome J. Weber*, of the same firm, were with him on the briefs for appellant.

*Leonard R. Frischer*, of Turner and Boisseau, Chartered, of Kansas City, Missouri, argued the cause, and *Casey R. Law*, of the same firm, of Great Bend, was on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is a declaratory judgment action. Gerald Lightner, special administrator of the estate of Jessie Lightner, appeals a judgment in favor of Centennial Life Insurance Company; Kansas Department of Revenue; and Lloyd and Vivian Lightner, co-administrators of the estate of Dale Lightner. Gerald brought suit to determine the proper payee of proceeds from six life insurance policies owned by Jessie Lightner. The district court held Centennial properly paid the proceeds to the estate of Jessie's husband, Dale Lightner.

This dispute arose from the following facts. Dale and Jessie Lightner, husband and wife, were killed simultaneously in an automobile accident in 1980. It is undisputed that at the time of the accident, Jessie was both owner and sole beneficiary of six insurance policies on the life of her husband. The policies had been issued by Life of America, Inc., and assumed by Centennial in 1972.

The Lightners died intestate, leaving eight children to share equally in both estates. Gerald claims that by wrongfully paying the proceeds of the policies, totalling $329,075.92, to the larger estate of Dale rather than the smaller estate of Jessie, Dale's estate is exposed to substantially greater federal estate tax liability.

The sole issue is whether the policies are ambiguous and require this court to construe their terms to determine the proper beneficiary under the facts of this case. The district court, in granting summary judgment in favor of Centennial, read the beneficiary provisions of the insurance contracts in light of K.S.A. 58-704. K.S.A. 58-704 provides that in cases of simultaneous death, policy proceeds are payable "as if the insured had survived the beneficiary." Thus, Dale, as *insured* in this instance, is deemed to have survived Jessie. The court then looked to the insurance policies to see where the proceeds were to go

when the sole beneficiary dies before the insured. The beneficiary clause in five of the policies provides:

"Unless otherwise provided herein, if any beneficiary dies before the Insured, the interest of such beneficiary shall vest in the surviving beneficiary or beneficiaries, if any; otherwise in the executors, administrators or assigns of the Insured."

The sixth policy is similar:

"The interest of any Beneficiary who dies before the Insured shall vest in the Insured unless otherwise provided herein. . . . If no Beneficiary shall survive the Insured, then payment of the proceeds shall be made to the executors or administrators of the Insured."

Applying the clear language of these provisions, the district court held Dale was the *insured*. Thus, Centennial paid the proceeds to Dale's estate.

The district court decided this case on the basis of documents and stipulated facts. The proper standard of appellate review in this case is thus de novo. *Crestview Bowl, Inc. v. Womer Constr. Co.,* 225 Kan. 335, 592 P.2d 74 (1979). This gives us the power to construe the effect of the policies differently than the district court. *Patrons Mut. Ins. Ass'n v. Harmon,* 240 Kan. 707, 732 P.2d 741 (1987).

The confusion in this case results from the different meanings of the word *insured.* In life insurance, *insured* usually refers to the person whose death obligates the insurer to pay. 2A Couch on Insurance § 23:1 (2d ed. rev. 1984). However, the word may also refer to the applicant, the owner, or a person who is both the beneficiary and premium payor. 44 C.J.S., Insurance § 49; Black's Law Dictionary 726 (5th ed. 1979). Jessie was all of these: applicant, owner, beneficiary, and premium payor. Both she and Dale could properly be termed the *insured.*

There is usually no difficulty with the term because in the typical situation the owner of the policy insures his own life for the benefit of another. In such a typical case, Dale would have applied for, paid for, and owned the policies on his life, with the proceeds upon his death going to Jessie as beneficiary.

Appellant contends the policies in question were drafted with only this typical scenario in mind. The printed provisions make no distinction between the insured and the owner; between the person whose life is insured, Dale, and the person who owns the

policy, Jessie. He argues the drafter used the word *insured* in provisions where *owner* was actually meant.

Appellant agrees the first use of *insured* in the beneficiary clauses refers to Dale, as the person whose life is insured, but argues the second use of *insured* refers to the owner of the policy, Jessie. He contends the drafter intended payment to go to the owner of the policy if no beneficiary survived, not to the estate of the person whose life was insured.

Centennial says the second use of *insured* in the beneficiary clause indicates it has the same meaning as its first use in the clause; *i.e.* referring to the person whose death will make the proceeds payable. It argues it would be nonsense to assume the second use of insured means *owner* when the first clearly does not.

Appellant points to a later policy, not in dispute here, which was originally drafted and issued by Centennial and which has as its beneficiary clause:

"If any Beneficiary shall die before the Insured, the interest of such Beneficiary shall vest in the Owner unless otherwise provided herein."

Appellant argues this provision differs from the earlier provisions originally drafted by Life of America only in that Centennial took care to distinguish the word *insured* from *owner*.

He contends Jessie's intent in buying the earlier policies was the same as in buying this policy, and under the same scheme of estate planning. She took care to be owner as well as beneficiary because the proceeds would be subject to less tax in her smaller estate than if the proceeds went to her husband's estate.

Centennial argues a later policy has no relevance in construing the language of earlier ones; all it proves is that terms can be different. It points out that in this later policy, Jessie made her children alternative beneficiaries, thus avoiding the controversy argued here. It protests appellant cannot assert all policies must be interpreted identically when Jessie herself provided for differing disposition of proceeds in these policies. Centennial also maintains the Lightners would not have died intestate if they were genuinely concerned with estate planning.

Appellant argues Centennial recognized the estate planning intentions of Jessie when she signed her application under the printed heading, "Signature of Owner, if incidents of ownership

are not to be vested in the Proposed Insured." He also maintains when Jessie added to her name, "or children in case of her death," she evidenced her intention that the proceeds should flow to her estate so her children would obtain the maximum amount of proceeds possible. He argues Jessie's writings conflict with Centennial's interpretation of the printed portions. If irreconcilable conflict is found to exist, preference should be given to the hand written portions when construing the policy. *Harrison v. Farmers & Bankers Life Ins. Co.,* 163 Kan. 277, 181 P.2d 520 (1947).

Appellant further contends Centennial failed to ensure the drafting of the policy conformed with Jessie's application and known intent. The application for insurance is to be construed with the policy as a whole to determine the parties' intent. *Leach v. Metropolitan Life Ins. Co.,* 124 Kan. 584, 261 Pac. 603 (1927), *reh. denied* 125 Kan. 129 (1928). The terms of a policy should be construed in light of the intent of the parties. *American Media, Inc. v. Home Indemnity Co.,* 232 Kan. 737, 658 P.2d 1015 (1983).

Appellant argues the district court's analysis was improper in that it ignored provisions in the contract which show Centennial did not use the term *insured* consistently. He calls attention to six provisions in the contract which use the word *insured* to mean *owner*. They are:

1. The beneficiary clause in the first five policies states if the beneficiary dies before the insured, the proceeds are to go to the "executors, administrators or *assigns* of the Insured." Emphasis added. Appellant argues this provision makes sense only when it is understood *insured* sometimes denotes *owner* in the policy. Only Jessie, as owner, had the right to assign the policies.

Centennial counters with the argument that *assigns* is simply a legal phrase which was used mechanically. It also argues that while Dale admittedly did not have the right to assign the policy as such, he might have assigned his estate's contingent right to take the proceeds. The term *assigns* is broad, and can encompass those who take remotely. Black's Law Dictionary 109 (5th ed. 1979); *Hoffeld v. United States,* 186 U.S. 273, 46 L. Ed. 1160, 22 S. Ct. 927 (1902) *(assignees).*

2. The parties repeat their arguments over the assignment clause in the policies: "Any assignment of this Policy by the

Insured shall operate so long as such Assignment remains in force, and to the extent thereof, to transfer the interest of any revocable beneficiary."

3. The loan provision of the policy states: "At any time while this policy shall be in force, . . . the Company, on the sole security of this policy and on receipt thereof, . . . will loan to the Insured any sum which shall not exceed the cash value of the policy . . . ."

Appellant points out Dale had no right to obtain loans against the policy. It was Jessie who had the right, and it was Jessie only who exercised that right.

4. Another loan provision guarantees that failure to repay a loan will not void the policy until notice is mailed "to the last known address of the Insured, and of the assignees on record . . . ." A second clause provides for an automatic premium loan upon "written request of the Insured, made prior to default in premium payment . . . ."

Appellant argues these provisions concerning loans and payment and default clearly speak to the owner rather than the person whose life is insured. He compares the notice provision in the disputed policies with that drafted by Centennial in the later policy, which states the policy is not void for nonpayment of a loan until "notice to the last known address of the *Owner* and . . . any assignee of record with the Company." Emphasis added.

5. The cash value clause states "the *Insured* may surrender this policy to the Company at its Home Office for its cash value . . . ." Emphasis added. *Insured* must refer to the *owner* in this clause. Centennial could not pay the cash value of policies over to debtors, small children, and others whose lives may be insured but who are not policy owners.

6. A clause headed "Cancellation by *Insured*" continues on to read, "This rider may be cancelled on the due date of any premium upon the written request of the *owner* of the policy . . . ." Emphasis added. This clearly indicates the drafter intended *insured* to denote *owner* in this instance.

Centennial complains appellant is not asking for an *interpretation* of the policies, but rather a reformation of the policies. It argues that, this being the case, appellant is barred from his

arguments because of lack of pleading, statute of limitations, and inability to meet a clear and convincing standard of proof.

It is clear appellant is not asking for reformation, he is merely asking us to interpret the meaning of the words used in the contract. The initial question is whether the language in the policy is clear and unambiguous. The scope of appellate review limits our authority to construe the terms of the policies. We may do so only if the term *insured* can be reasonably deemed open to different interpretations. *Girrens v. Farm Bureau Mut. Ins. Co.*, 238 Kan. 670, 715 P.2d 389 (1986).

If a natural reading of a contract as a whole leaves one uncertain about the consistent meaning of a term, the contract is ambiguous. *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. at 713.

Because the term *insured* in the policies applies sometimes to Dale and sometimes to Jessie, it is clear the use of the term *insured* in these contracts of insurance is ambiguous.

Finding the insurance policies are ambiguous, we are constrained to construe the policies as a whole, rather than limiting our scrutiny to the beneficiary clause. See *Kennedy v. Classic Designs, Inc.*, 239 Kan. 540, 543-44, 722 P.2d 504 (1986). We should also take into consideration the intent of the parties in making the contract. *Crestview Bowl, Inc. v. Womer Constr. Co.*, 225 Kan. at 340.

The United States Supreme Court found the use of the word *assured* in a policy to have different meanings, requiring it to construe the meaning of the word in the beneficiary clause according to the circumstances in which the policy was made. It first stated it considers the word *assured* synonoymous with *insured. Connecticut Mut. Life Ins. Co. v. Luchs*, 108 U.S. 498, 504, 27 L. Ed. 800, 2 S. Ct. 949 (1883). See 43 Am. Jur. 2d, Insurance § 189.

The confusion over the term *assured* in *Luchs* is remarkably similar to the case presently before the court. In *Luchs* the plaintiff, who was applicant, beneficiary, and premium payor, insured the life of his debtor partner. He then had to argue he was the *assured* to whom the beneficiary clause promised the money. The court held the term *assured* has no fixed meaning and must be defined according to its context in the policy and by consideration of the purpose in obtaining the insurance. *Luchs*,

108 U.S. at 503-04. See *Shapiro Bros. Factors Corp. v. Automobile Ins. Co.*, 40 F. Supp. 1, 3 (D.N.J. 1941). As it was the applicant's intention to benefit from the insurance, he was in this case held to be the *assured* designated in the beneficiary clause. *Luchs*, 108 U.S. at 504.

An insurance contract is generally liberally construed against the insurer. *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. at 713. Centennial argues the "construction against insurer" rule should not apply in this case because it paid all it owed. It argues the rule is legitimately used only to ensure maximum coverage of the applicant, citing *Equitable Life Assur. Soc. of U.S. v. Pinon*, 344 So. 2d 880 (Fla. Dist. App. 1970), where the court refused to apply the rule because it did not find the language ambiguous.

Centennial argues an extension of the rule to cases where the insurer admittedly pays all that is owed would possibly expose insurers to inconsistent presumptions. For example, if this were a case where the heirs of both estates were not the same people, each might argue the "construction against the insurer" rule for their own benefit. The insurance company would lose no matter which estate it paid the money to.

The purpose of the "construed against the insurer" rule, however, is not to predetermine disputes but only to assist the court in determining the intent of the parties to the contract. *Liberty Mutual Ins. Co. v. Allied Mutual Ins. Co.*, 442 F.2d 1151 (10th Cir. 1971). The basis for construing an insurance policy against the insurer in close cases is simply the rule of contracts that the drafter must suffer the consequences of not making the terms clear. See *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. at 713; *Desbien v. Penokee Farmers Union Cooperative Association*, 220 Kan. 358, 363, 552 P.2d 917 (1976); 2 Couch on Insurance § 15:74 (2d ed. rev. 1984).

The policies, read in their entirety, use the term *insured* to refer to both the one whose life is insured and the owner of the policy. The term is thus ambiguous where these entities are two different people. We hold Jessie Lightner purchased the policies of insurance on the life of her husband, Dale Lightner, for the specific purpose of preventing the proceeds of the policies from becoming a part of Dale Lightner's estate. We therefore hold the

Estate of Jessie Lightner is entitled to the proceeds from the policies of insurance on Dale Lightner's life.

The decisions of the district court and Court of Appeals are reversed and Lloyd Lightner and Vivian Lightner, co-administrators of the Estate of Dale R. Lightner, deceased, are ordered to pay the proceeds from the life insurance policies to the Estate of Jessie M. Lightner, deceased.