**FIRST FEDERAL SAVINGS BANK OF NEWTON, KANSAS, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, one of the CNA Insurance Companies, Defendant.**

**Civ. A. No. 88–1061–T.**

United States District Court, D. Kansas.

June 20, 1991.

Edward J. Hund, Focht, Hughey, Hund & Calvert, Wichita, Kan., for plaintiff.

Harold E. Jones, Hershberger, Patterson, Jones & Roth, Wichita, Kan., Peter Sullivan, Edward Grant, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the motion of defendant for summary judgment. (Doc. 62). This diversity action is a demand for a money judgment arising from a fidelity bond. Plaintiff claims that it incurred losses on certain loans, and that these losses are covered under the terms of a Savings and Loan Blanket Bond ("the Bond") issued to plaintiff by defendant's predecessor.

### I. *Stipulated Facts*

1. On November 1, 1983 MGIC Indemnity Corporation issued the subject Bond. Defendant ("CNA") is the successor underwriter of the Bond.

2. Construction Mortgage Company ("CMC") is a subsidiary of plaintiff ("First Federal"). CMC was, at all times relevant hereto, a named insured on the Bond.

3. The loans at issue were for two construction projects in which Edgewater Management, Inc. ("EMI") was involved. CMC was the lender, and EMI the borrower, for the loans on both projects.

4. Two loans are at issue. The first loan was issued in March 1983 in the amount of $750,000.00 ("the Building 11 loan"), and the second was issued in February 1984 in the amount of $1,150,000.00 ("the Building 12 loan"). First Federal purchased a 100 percent participation in both loans, meaning that it provided all the funds disbursed by CMC to EMI.

5. The procedure by which CMC and First Federal made these disbursements was specified in a Loan Disbursement Agreement signed by CMC as the lender, EMI as the borrower, the Mountain Land Title Insurance Agency ("Mountain Land Title"), and an architectural firm. According to the Loan Disbursement Agreement, EMI was to submit monthly draw requests, which, if approved by CMC, would be funded by the loan proceeds.

6. The draw requests that CMC received from EMI included: (1) AIA G702 and G703 forms; (2) transmittal of invoices form; (3) a site inspection report; (4) copies of invoices submitted for payment by the subcontractors; and (5) copies of the checks drawn on EMI's account at Packers National Bank, Omaha, Nebraska, in the amount of payment requested by each respective subcontractor. The same documents were to be sent to Mountain Land Title, except that Mountain Land Title was to receive the originals of item (5), i.e., the checks made payable to the subcontractors.

7. After verifying the draw request, CMC would contact Mountain Land Title to determine if any additional liens had been placed upon the property. If there were no liens, CMC would approve funding of the draw request and arrange for wire transfer of funds to the trust account of Mountain Land Title.

8. Once it received the funds, Mountain Land Title was responsible for transferring the funds to EMI's account at the Bank of Winter Park, Colorado. EMI was then responsible for transferring the funds to its account at Packers National Bank in Omaha.

9. The draw requests submitted by EMI contained the following irregularities: (a) several of the AIA G702 and G703 forms, and also the site inspection reports, stated percentages of completion of the two building projects that differed from the reports prepared by other personnel who inspected the properties; (b) some of the invoices were in fact prepared by EMI, although they purported to be prepared by the subcontractors; (c) copies of lien waivers returned to CMC sometime after the disbursement of funds on each draw account contained signatures of subcontractors that were not genuine.

10. Neither First Federal nor CMC ever received the original executed lien waivers that appeared on the back of the checks made payable to the subcontractors. Instead, between 2–6 weeks after the funding of the draw request, CMC would receive from EMI copies of the executed lien waivers.

11. Many of the checks for which CMC had received copies as part of the draw requests were never sent to, nor negotiated by, the subcontractor-payees. In most cases, EMI gave the subcontractor-payees checks that were substantially less than the amounts disbursed to EMI pursuant to its draw requests. In some cases, EMI did not pay the subcontractors at all.

12. Virtually all the copies of the lien waivers received by CMC after it had disbursed funds to EMI for the subcontractors bore signatures that were not signed by the actual principals of the subcontractors.

13. After First Federal took possession of Building 11 and 12, several subcontractors presented several unpaid bills to First Federal. First Federal either paid these bills, or paid the subcontractors certain amounts to settle the subcontractors' liens on the buildings. First Federal was also required to spend additional funds to complete Building 11, although this building had been represented as 100% complete in

a site inspection report submitted by EMI in its draw request.

14. As part of the loan application process, EMI submitted subcontractor agreements for both Building 11 and 12. EMI submitted subcontractor agreements bearing signatures that were either non-genuine or absent. In addition, the signature of one of the project architects was forged on a site inspection report.

In its complaint, First Federal claims that EMI and its agents engaged in a "pattern and practice of fraud, forgery and misrepresentation" that includes "forged lien waiver endorsements, forged and altered subcontract agreements, forged personal guarantees of payment, forged personal guarantees of completion, fraudulent misrepresentation on Sworn Construction Cost Statements, fraudulent misrepresentations on Sworn Construction Cost Breakdowns, forged and altered draw requests and forged and altered site inspection reports." Complaint ¶ 12. Plaintiff claims to have suffered a loss exceeding $1,540,-000.00 as a result of the actions of EMI. Prior to instituting this action, plaintiff submitted to defendant a sworn proof of loss in the amount of $1,461,893.31, claiming that this loss was covered under the terms the Bond.

## II. *The Blanket Bond*

The Bond provides coverage to the lender for losses resulting from the non-payment or default upon loans only as specified under "Insuring Agreements (A), (D) or (E)" of the Bond. (Doc. 62, Eht. B., p. 5). In response to interrogatories, plaintiff has stated that it is relying on Insuring Agreements (D) and (E) as a basis for coverage. Insuring Agreement (D) of the Bond provides coverage for:

Loss resulting directly from

(1) Forgery or alteration of, on or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, withdrawal order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit,

(2) transferring, paying or delivering any funds of Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or banking institution....

Doc. 62, Eht. B, p. 2. Insuring Agreement (E) of the Bond provides coverage for:

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original

(a) Security

(b) Document of Title,

(c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,

(d) Certificate of Origin or Title,

(e) Evidence of Debt,

(f) corporate, partnership or personal Guarantee, or

(g) Security Agreement

which

(i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery or

(ii) is altered, or

(iii) is lost or stolen;

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (a) through (g) above;

(3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon any item listed in (a)

through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (g) above by the Insured, its correspondent institution or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

Doc. 62, Eht. B, p. 3.

For a loss to be covered under Insuring Agreement (D), it is required that the loss result directly from: (1) a forgery or alteration of, on, or in a negotiable instrument or a withdrawal order; or (2) an extension of credit in reliance upon a written instruction or advice bearing a forged signature which purports to be that of a customer of First Federal.

Coverage will lie under Insuring Agreement (E) for either a forgery or a counterfeit. For the loss to be covered as a forgery, it is required that: (1) the loss resulted from First Federal extending credit or assuming liability in reliance upon one of the types of documents described in categories (a) through (g); and (2) such document was an original; and (3) such document bore a forged signature, or was altered; and (4) First Federal had actual physical possession of the document.

For the loss to be covered as a counterfeit, the requirements are that: (1) the loss resulted from First Federal extending credit or assuming liability in reliance upon one of the types of documents described in categories (a) through (d); and (2) such document was a counterfeit; and (3) First Federal had actual physical possession of the document.

## III. *Discussion*

Plaintiff claims that the Blanket Bond extends coverage because of the forgery, alteration, or counterfeit of 6 types of documents submitted to it by EMI: (1) subcontractor lien waivers stamped on the backs of checks made payable to EMI's subcontractors; (2) site inspection reports; (3) Sworn Construction Cost Statements; (4) subcontractor agreements; (5) invoices submitted with draw requests; (6) checks drafted in favor of the subcontractors.

The court's construction of the Bond is guided by well-established principles of insurance contract law. Ambiguities in an insurance contract are to be construed against the insurer. *E.g., Royal College Shop, Inc. v. Northern Ins. Co.*, 895 F.2d 670, 674 (10th Cir.1990); *Heinson v. Porter*, 244 Kan. 667, 672, 772 P.2d 778 (1989); *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 744 P.2d 840, syl. ¶ 7 (1987). In the absence of ambiguity, however, the terms of the insurance policy are to be construed according to their plain, ordinary, and popular sense. *E.g., Kansas State Bank & Trust Co. v. Old Am. Ins. Co.*, 491 F.2d 307, 309–10 (10th Cir.1974); *Unified School Dist. No. 501 v. Continental Casualty Co.*, 723 F.Supp. 564, 566 (D.Kan.1989). The burden is upon the insured to prove that his claimed loss falls within the terms of a general coverage clause, whereas the insurer bears the burden of proving that the loss is excluded under a specific exception to general coverage. *Dronge v. Monarch Ins. Co.*, 511 F.Supp. 1, 5 (D.Kan.1979); *Clark Equip. Co. v. Hartford Accident & Indemnity Co.*, 227 Kan. 489, 491, 608 P.2d 903 (1980); *Central Sec. Mutual Ins. Co. v. DePinto*, 235 Kan. 331, 334–35, 681 P.2d 15 (1984).

### A. Coverage Under Section (D) of the Bond

■ Plaintiff seeks coverage under Insuring Agreement (D) for the loss allegedly caused by: (1) a forged site inspection report dated October 24, 1983 that accompanied a draw request; (2) lien waivers stamped on the backs of checks made out to the subcontractors; and (3) subcontractor agreements. The arguments with respect to each of these documents is the same, and the court therefore considers them together.

Plaintiff contends that each of the three documents were "withdrawal orders" within the meaning of Insuring Agreement (D)(1). The term "withdrawal order" is not

given any special definition in the Bond, and the court must therefore construe this term according to its ordinary and plain meaning. The term "order" as defined under the Uniform Commercial Code is useful for present purposes.

> An "order" is a direction to pay and must be more than an authorization or request. It must identify the person to pay with reasonable certainty. It may be addressed to one of more such persons jointly or in the alternative but not in succession.

K.S.A. § 84-3-102(b). *See also Black's Law Dictionary* 988 (5th ed. 1979).

The court is unable to convert either a "request" or the documents accompanying this request into an "order." Plaintiff's expansive conception of a withdrawal order would transform virtually any document, having even the most remote bearing upon the disbursement of funds, into a withdrawal order. The site inspection reports, as well as all the documents submitted to CMC in the monthly process of loan disbursements, did not "order" or "direct" the payment of money. As specified in the Loan Disbursement Agreement, the documents submitted to CMS were merely an application for payment, subject to the approval of CMC. "The court will not torture words to import ambiguity when ordinary meaning leaves no room for such." *Canal Ins. Co. v. Earnshaw*, 629 F.Supp. 114, 118 (D.Kan.1985). Thus, the court rejects plaintiff's attempts to convert the site inspection reports and the subcontractor agreements into a withdrawal order as that term is commonly understood.

■ A separate discussion is required for the lien waivers. The role of the subcontractor lien waivers in the withdrawal process is relevant to the court's analysis.

Under the terms of the Loan Disbursement Agreement, Mountain Land Title was to control the actual disbursements of the proceeds of the loans from CMC to EMI. (Doc. 62, Eht. E, page 1, ¶ C). When EMI desired a disbursement of loan proceeds, it was to submit to Mountain Title a copy of the loan application as well as the actual, original checks EMI had prepared in the amounts and to the subcontractors as set forth in the application. After CMC had received the loan application and accompanying documents, CMC would notify Mountain Land Title of its approval of the loan. At the same time, Mountain Land Title would inform CMC of any liens in the construction property. CMC would then transfer the approved loan proceeds to the trust account of Mountain Land Title, which proceeds Mountain Land Title would then transfer to an account controlled by EMI. Mountain Land Title was then to deliver to the subcontractor-payees the checks that had been prepared by EMI. Before delivering these checks, however, Mountain Land Title was to stamp a lien waiver on the back of each check. By endorsing the check, the subcontractor also executed a waiver of any lien it held in the subject property. (Doc. 62, Eht. E, pages 2-3, ¶¶ 2 & 5).

In fact, the above described process was not strictly observed. At some point, CMC authorized Mountain Land Title to deliver directly to EMI the original checks made payable to the subcontractors. Doc. 62, Eht. M (Plaintiff's Response to Second Request for Admissions, ¶ 5). Thus, as a matter of practice, Mountain Land Title would send the prepared checks, stamped with the lien waiver, to EMI, who was to convey them to the subcontractors. Neither CMC, First Federal, nor Mountain Land Title ever received original executed lien waivers. Instead, between 2–6 weeks after the funding of the draw request, CMC would receive from EMI copies of the executed lien waivers. It is stipulated that virtually all the copies of the lien waivers received by CMC after it had disbursed funds to EMI for the subcontractors bore signatures that were not signed by the actual principals of the subcontractors.

■ Defendant argues that the lien waivers were not "withdrawal orders" within the meaning of Insuring Agreement (D)(1). The court agrees that the lien waivers cannot be considered a withdrawal order within the plain and ordinary meaning of that term. The language of the Bond, however, provides for coverage of a "[l]oss

resulting directly from (1) Forgery or alteration of, *on or in any* Negotiable Instrument (except an Evidence of Debt), Acceptance, *withdrawal order,* receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit,...." (emphasis added). Defendant does not dispute that the checks were withdrawal orders. *See Coleman v. Brotherhood State Bank,* 3 Kan.App.2d 162, 171, 592 P.2d 103 (1979). Thus, it is irrelevant that there was no forgery or alteration *of* the actual withdrawal order. Under the terms of the Bond, coverage extends to any loss resulting directly from a forgery or alteration *on or in* the checks.

■ The court also finds it irrelevant that the plaintiff only received copies of the lien waivers after the funds were disbursed to EMI. Insuring Agreement (D)(1) refers only to losses that are directly caused by forgeries or alterations of, on, or in the described documents. Unlike losses under Insuring Agreement (E), there is no requirement that the forgery or alteration under (D)(1) have induced action or inaction on the part of the insured. The court is unable to say as a matter of law that plaintiff's loss did not result directly from the forged signature, and a question fact is therefore presented.

### B. Coverage under Section (E) of the Bond

■ Plaintiff argues that the following four documents were counterfeits within the meaning of the Bond, and that they are covered under Insuring Agreement (E): (1) the Sworn Construction Cost Statements; (2) the subcontractor agreements; (3) the subcontractor invoices; and (4) the subcontractor checks. Plaintiff argues that these are documents "creating or discharging a lien upon real property," and thus covered under section (E)(1)(c).

The parties agree that Colorado law controls whether the documents in question create or discharge a lien for real property located in Colorado. Under Colorado law, a mechanic's lien exists only as prescribed by statute. Section 38–22–101(1) of the Colorado Revised Statutes provides in relevant part:

> Every person who supplies machinery, tools, or equipment in the prosecution of the work, and mechanics, materialmen, contractors, subcontractors, builders, and all persons of every class performing labor upon or furnishing directly to the owner or persons furnishing labor materials to be used in construction, ... shall have a lien upon the property upon which they have supplied machinery, tools, or equipment or rendered service or bestowed labor....

In addition, Colo.Rev.Stat. § 38–22–109(1) provides that "[a]ny person wishing to avail himself of the provisions" governing mechanic's liens "shall file for the record, in the office of the county and recorder of the county" a lien statement. *See also Amoco Elec. Co. v. First Nat'l Bank of Denver,* 622 P.2d 608, 609 (Colo.App.1981) ("A mechanics lien established under the statute is based upon the principle that one who has enhanced the value of property by his labor or material is entitled to a superior lien if he follows certain prescribed procedures."). Plaintiff contends that the lien is already created when the work is performed or the materials are supplied, and that the filing of the statement is only a prerequisite to the enforcement of the lien. Thus, plaintiff argues that documents evincing the performance of work create a mechanic's lien under Colorado law.

The court is unpersuaded. It is not necessary to determine whether a lien is created under Colorado law by the performance of work, or rather by the filing of the lien statement. Even accepting plaintiff's argument that lien is created by the performance of work or the furnishing of materials, it does not follow that any document evincing this work creates the lien. To the contrary, plaintiff's contention is that a lien is created simply by virtue of labor performed or materials supplied, without any need for further documentation. Thus, even if the documents relied upon are forgeries or counterfeits within the meaning of the Bond, neither the construction costs statements, the subcontrac-

tor agreements, nor the subcontractor invoices, provide any basis for coverage.

■ Plaintiff argues that the checks made out to the subcontractors are documents discharging rather than creating a lien. As the court understands this argument, the checks were instruments discharging the subcontractors' liens because the checks purported to pay for work that the subcontractor had done. Plaintiff does not seek coverage under Insuring Agreement (E)(1) for the forged lien waivers stamped on the backs of the checks.[1] Rather, plaintiff contends that the checks themselves were "counterfeits," and that coverage therefore extends under Insuring Agreement (E)(3). To prevail under (E)(3), plaintiff must prove that: (1) the checks were documents that discharged a lien; (2) plaintiff had actual physical possession of the checks themselves or at least copies of the checks; (3) plaintiff extended credit in reliance upon the checks or copies thereof; and (4) the checks were counterfeits. The court assumes the existence of the first three requirements and focuses its analysis on the requirement that the document be a counterfeit.

The Bond defines a counterfeit to mean "an imitation which is intended to deceive and to be taken as an original." Doc. 62, Eht. B, page 4, § 1(d). Plaintiff notes that the checks submitted and then disbursed by Mountain Land Title were not the actual checks given to the subcontractors by EMI. Instead, the subcontractors were paid with other checks or documents, or, in some instances, the subcontractors were not paid at all. Thus, although the checks sent to Mountain Land Title purported to be documents that paid the subcontractors for their work, plaintiff contends these checks were only limitations "intended to deceive and to be taken as an original."

The court cannot agree. "The courts have consistently held that to be counterfeit under a Bankers or S & L Bond, the allegedly counterfeit instrument must be an imitation of an actual existing (or previously existing) original genuine document." *Reliance Ins. Co. v. Capital Bancshares, Inc.,* 685 F.Supp. 148, 150 (N.D.Tex.1988). *See also Gateway State Bank v. North River Ins. Co.,* 387 N.W.2d 344, 348 (1986). In essence, plaintiff contends that a document intended for the use of one becomes a counterfeit when misused or misappropriated by another. Thus, if the parties had used currency instead of checks in their transactions, the logical extension of plaintiff's argument would mean that EMI could have converted genuine U.S. currency into counterfeit currency simply by withholding from the subcontractors part of the payment sent to EMI by Mountain Land Title. Moreover, plaintiff's argument suffers from an internal inconsistency; by declaring the checks counterfeits, plaintiff defeats its premise that these instruments could discharge a lien. The checks submitted to Mountain Land Title by EMI, and then delivered back to EMI, were genuine drafts, imitated nothing, and were exactly what they purported to be: checks payable to the respective subcontractors. Because the checks were not counterfeits, coverage does not extend under Insuring Agreement (E)(2).

### IV. *Conclusion*

The court finds that plaintiff has demonstrated a genuine issue of material fact only as to coverage under Insuring Agreement (D)(1) for the forged lien waivers. Thus, summary judgment must be denied on this ground. Coverage under the Bond for the irregularities in the remaining documents, however, does not exist as a matter of law.

IT IS BY THE COURT THEREFORE ORDERED that defendant's motion for summary judgment (Doc. 62) be denied.

---

1. In any event, such reliance would be unavailing. Coverage exists under Insuring Agreement (E)(1) only if the insured acted upon the *original* of a document bearing a forged signature. Neither CMC nor its agent Mountain Land Title ever had actual physical possession of the executed lien waivers. Instead, CMC received only copies, rather than originals, of the forged lien waivers, and received these copies 2–3 weeks after the disbursements had been made.