**RESOLUTION TRUST CORPORATION, in its corporate capacity, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, one of the CNA Insurance Companies, Defendant.**

**Civ. A. No. 88–1061–T.**

United States District Court, D. Kansas.

Sept. 14, 1992.

H.E. Jones, Hershberger, Patterson, Jones & Roth, Wichita, Kan., Peter Sullivan and Edward Grant, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., on brief, for defendant.

Kenneth G. Gale, Focht, Hughey & Calvert, Wichita, Kan., on brief, for plaintiff.

## MEMORANDUM AND ORDER

THEIS, District Judge.

First Federal Savings Bank of Newton, Kansas ("First Federal") brought this action against defendant Continental Casualty Company, seeking a declaration that certain losses incurred by it on two construction loans are covered under a savings and loan blanket bond issued to First Federal by the defendant. The loans in question were issued by First Federal's wholly-owned subsidiary, Construction Mortgage Corporation ("CMC"), an additional insured under the bond. The borrower, Edgewater Management, Inc. ("EMI"), a developer of condominiums in Winter Park, Colorado, defaulted on the two loans at issue. First Federal and CMC accepted a deed in lieu of foreclosure on the two condominium buildings, one of which was substantially complete, and one of which was still under construction. First Federal claimed losses for overdisbursement on certain labor and materials, the cost of completing construction, loan losses, and associated expenses. *See* Pretrial Order, Doc. 65. In a previous memorandum and order, the court granted

defendant's motion for summary judgment as to all but one of First Federal's theories of recovery under the bond. Doc. 77. The plaintiff, Resolution Trust Corporation, in its corporate capacity, is the successor to First Federal. *See* Plaintiff's Exh. 30 (Contract of sale between Resolution Trust Corporation in its capacity as Receiver of First Federal and Resolution Trust Corporation in its corporate capacity, dated October 28, 1991).

This matter was tried to the court on May 26, 1992. The court heard the testimony of two witnesses and received into evidence the deposition testimony of other witnesses as well as voluminous documentary evidence. After considering the evidence presented, the court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On November 1, 1983 MGIC Indemnity Corporation issued the subject bond. Plaintiff's Exh. 1. Defendant is the successor underwriter of the bond. Plaintiff's Exh. 1 (assumption endorsement).

2. Construction Mortgage Company ("CMC") is a subsidiary of plaintiff ("First Federal"). CMC was, at all times relevant hereto, a named insured on the bond. Plaintiff's Exh. 1, Schedule "A."

3. The loans at issue were for two construction projects in which Edgewater Management, Inc. ("EMI") was involved. CMC was the lender, and EMI the borrower, for the loans on both projects. Vernon Cagle was the President of EMI.

4. Two loans are at issue. The first loan was issued in March 1983 in the amount of $750,000.00 ("the Building 11 loan"), and the second was issued in February 1984 in the amount of $1,150,000.00 ("the Building 12 loan"). First Federal purchased a 100 percent participation in both loans, meaning that it provided all the funds disbursed by CMC to EMI.

5. The procedure by which CMC and First Federal made these disbursements was specified in a Loan Disbursement Agreement signed by CMC as the lender,

EMI as the borrower, the Mountain Land Title Insurance Agency ("Mountain Land Title"), and an architectural firm. According to the Loan Disbursement Agreement, EMI was to submit monthly draw requests, which, if approved by CMC, would be funded by the loan proceeds. Plaintiff's Exhs. 2 and 3.

6. The draw requests that CMC received from EMI included: (1) AIA G702 and G703 forms; (2) transmittal of invoices form; (3) a site inspection report; (4) copies of invoices submitted for payment by the subcontractors; and (5) copies of the checks drawn on EMI's account at Packers National Bank, Omaha, Nebraska, in the amount of payment requested by each respective subcontractor. The same documents were to be sent to Mountain Land Title, except that Mountain Land Title was to receive the originals of item (5), i.e., the checks made payable to the subcontractors.

7. After verifying the draw request, CMC would contact Mountain Land Title to determine if any additional liens had been placed upon the property. If there were no liens, CMC would approve funding of the draw request and arrange for wire transfer of funds to the trust account of Mountain Land Title.

8. Once it received the funds, Mountain Land Title was responsible for transferring the funds to EMI's account at the Bank of Winter Park, Colorado. EMI was then responsible for transferring the funds to its account at Packers National Bank in Omaha.

9. The draw requests submitted by EMI contained the following irregularities: (a) several of the AIA G702 and G703 forms, and also the site inspection reports, stated percentages of completion of the two building projects that differed from the reports prepared by other personnel who inspected the properties; (b) some of the invoices were in fact prepared by EMI, although they purported to be prepared by the subcontractors; (c) copies of lien waivers returned to CMC sometime after the disbursement of funds on each draw contained signatures of subcontractors that were not genuine.

10. As noted above, under the terms of the Loan Disbursement Agreement, Mountain Land Title was to control the actual disbursements of the proceeds of the loans from CMC to EMI. Plaintiff's Exh. 2, page 1, ¶ C, Exh. 3, page 1, ¶ C. When EMI desired a disbursement of loan proceeds, it was to submit to Mountain Land Title a copy of the loan application as well as the actual, original checks EMI had prepared in the amounts and to the subcontractors as set forth in the application. After CMC had received the loan application and accompanying documents, CMC would notify Mountain Land Title of its approval of the loan. At the same time, Mountain Land Title would inform CMC of any liens on the construction property. CMC would then transfer the approved loan proceeds to the trust account of Mountain Land Title, which proceeds Mountain Land Title would then transfer to an account controlled by EMI. Mountain Land Title was then to deliver to the subcontractor-payees the checks that had been prepared by EMI. Before delivering these checks, however, Mountain Land Title was to stamp a lien waiver on the back of each check. By endorsing the check, the subcontractor also executed a waiver of any lien it held in the subject property. Plaintiff's Exhs. 2 and 3; *see* Plaintiff's Exh. 11 (intended route of check/lien waiver).

11. In practice, the parties deviated from the prescribed procedure. While EMI still delivered the original checks to Mountain Land Title, and Mountain Land Title still placed the lien waiver stamps on the backs of the checks, Mountain Land Title ceased delivering the checks to the subcontractors itself. Rather, Mountain Land Title allowed EMI's Vernon Cagle to obtain the original checks. CMC authorized Mountain Land Title to deliver directly to EMI the original checks made payable to the subcontractors. Defendant's Exh. E (Plaintiff's Response to Second Request for Admissions, ¶ 5). Thus, as a matter of practice, Mountain Land Title would send the prepared checks, stamped with the lien waiver, to EMI, who was to convey them to the subcontractors. *See* Plaintiff's Exh. 12 (actual route of check/lien waiver).

12. Neither First Federal nor CMC ever received the original executed lien waivers that appeared on the back of the checks made payable to the subcontractors. Instead, between two and six weeks after the funding of the draw request, CMC would receive from EMI copies of the executed lien waivers.

13. Many of the checks for which CMC had received copies as part of the draw requests were never sent to, nor negotiated by, the subcontractors. In most cases, EMI gave the subcontractors checks that were substantially less than the amounts disbursed to EMI pursuant to its draw requests. In some cases, EMI did not pay the subcontractors at all.

14. Virtually all the copies of the lien waivers received by CMC after it had disbursed funds to EMI for the subcontractors bore signatures that were forged.

15. First Federal discovered the fraud in May 1985, when subcontractor Gretna Lumber reported that it had not been paid for work and materials supplied to Buildings 11 and 12. In examining various records, First Federal and CMC discovered that Gretna Lumber's receipts did not equal CMC's disbursements to EMI for payment of Gretna Lumber. Examination of CMC's copies of Gretna Lumber's lien waivers led to the discovery that the signatures did not always match. Gretna Lumber's principal further reported that he did not sign the lien waivers on the checks he received; rather, he endorsed the checks with a "for deposit only" stamp.

16. First Federal's discovery of the problem involving subcontractor Gretna Lumber led to the discovery that other checks had not been sent to other subcontractors and that the lien waivers subsequently received by CMC were forgeries.

17. First Federal submitted its proof of loss to the defendant on or about September 25, 1987.

18. After First Federal took possession of Buildings 11 and 12, several subcontractors presented several unpaid bills to First Federal. First Federal either paid these bills, or paid the subcontractors certain

amounts to settle the subcontractors' liens on the buildings. First Federal was also required to spend additional funds to complete Building 11, although this building had been represented as 100% complete in a site inspection report submitted by EMI in its draw request.

19. On both buildings a number of draw requests were funded before the forgery was discovered. A total of 27 checks with allegedly forged lien waivers are at issue here—16 checks for Building 11, and 11 checks for Building 12. Defendant's Exh. P. Defendant does not dispute that the copies of the lien waivers which were received by CMC contained forged signatures.

20. Of the checks submitted for approval through the draw request procedure (Plaintiff's Exhs. 5 and 6, Tabs 7), only the six checks listed in Defendant's Exh. M were actually negotiated by the payee.

21. The six checks listed in Defendant's Exh. M—i.e., those that were negotiated—have lien waiver forms stamped on the reverse.

22. The remaining 21 checks have disappeared.

23. EMI's bank records contain copies of numerous checks paid to subcontractors for work on Buildings 11 and 12 which were not submitted for approval through the draw request procedure. None of these checks have stamped lien waiver forms on the reverse.

24. Copies of the six checks that were actually received and cashed by the subcontractors were admitted. Defendant's Exhs. M–1 and M–2 (EMI's bank statements with copies of canceled checks, June 1984 and July 1984).

25. The six original checks that were cashed by the subcontractors bear genuine endorsements either by signature or by stamp, or no endorsement is apparent from the copy available. As reflected in EMI's bank records, these six checks do not bear forged endorsements/lien waivers. No forged signatures appear on the bank copies of the six checks that were negotiated by the subcontractors.

26. CMC received copies of forged endorsements/lien waivers from EMI for these six checks. *Compare* Defendant's Exhs. M–1 and M–2, check nos. 3988, 3989, 3990 *with* Plaintiff's Exh. 5, Building 11, draw 7, tab 9, check nos. 3988, 3989, 3990. *Compare* Defendant's Exhs. M–1 and M–2, check nos. 4004, 4007, 4116 *with* Plaintiff's Exh. 6, Building 12, draw 3, tab 9, check nos. 4004, 4007, draw 4, tab 9, check no. 4116.

27. One lien waiver received by CMC appears to have been forged after the check cleared the bank. *Compare* Defendant's Exh. M–2, check no. 4116 (bank copy) *with* Plaintiff's Exh. 6, Building 12, draw 4, tab 9 (lien waiver received by plaintiff). The other lien waivers received by CMC from EMI do not contain any stamps such as would be placed on the backs of the checks during the negotiation process.

28. Based on a comparison of the bank records of the six canceled EMI subcontractor checks and CMC's copies of the purported lien waivers, it is most likely that Cagle/EMI forged copies of the lien waivers and not the original lien waivers that appeared on the back of the original checks to the subcontractors. Had Cagle forged the original checks, such forgeries would have appeared in the bank copies of the six canceled checks.

29. There is an absence of evidence regarding the other original checks. The other original checks were never negotiated. It is suspected that Cagle destroyed them.

30. Plaintiff cannot prove that the forgeries were on the original subcontractor checks, since most of the originals have disappeared and the six checks that were cashed by the subcontractors do not have forged endorsements/lien waivers.

## CONCLUSIONS OF LAW

1. This action is brought under this court's diversity jurisdiction. 28 U.S.C. § 1332. The court has personal jurisdiction of the parties. Venue is proper in this district. 28 U.S.C. § 1391(a). The parties agree that Kansas law governs.

■ 2. Under Kansas law, a surety bond is treated as a contract for insurance. *Shearson/American Express, Inc. v. First Continental Bank & Trust Co.*, 579 F.Supp. 1305, 1309 (W.D.Mo.1984) (applying Kansas law). The court interprets a fidelity bond pursuant to the liberal rules applicable to insurance contracts and not the strict rules of suretyship. *United Bank & Trust Co. v. Kansas Bankers Surety Co.*, 901 F.2d 1520, 1522 (10th Cir. 1990).

■ 3. Ambiguities in an insurance contract are to be construed against the insurer. *E.g., Royal College Shop, Inc. v. Northern Ins. Co.*, 895 F.2d 670, 674 (10th Cir.1990); *Heinson v. Porter*, 244 Kan. 667, 672, 772 P.2d 778 (1989); *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 744 P.2d 840, syl. ¶ 7 (1987).

■ 4. In the absence of ambiguity, however, the terms of the insurance policy are to be construed according to their plain, ordinary, and popular sense. *E.g., Kansas State Bank & Trust Co. v. Old American Ins. Co.*, 491 F.2d 307, 309–10 (10th Cir. 1974); *Unified School Dist. No. 501 v. Continental Casualty Co.*, 723 F.Supp. 564, 566 (D.Kan.1989).

■ 5. The burden is upon the insured to prove that his claimed loss falls within the terms of a general coverage clause, whereas the insurer bears the burden of proving that the loss is excluded under a specific exception to general coverage. *Dronge v. Monarch Ins. Co.*, 511 F.Supp. 1, 5 (D.Kan.1979); *Clark Equipment Co. v. Hartford Accident & Indemnity Co.*, 227 Kan. 489, 491, 608 P.2d 903 (1980); *Central Security Mutual Ins. Co. v. DePinto*, 235 Kan. 331, 334–35, 681 P.2d 15 (1984).

6. Section 2(e) of the Savings and Loan Blanket Bond provides in pertinent part:

This bond does not cover:
loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, ... whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pre-

tenses, except when covered under Insuring Agreements (A), (D) or (E).
Plaintiff's Exh. 1.

7. Insuring Agreement (D)(1) of the bond provides coverage for:

Loss resulting directly from
(1) Forgery or alteration of, on or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, withdrawal order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit, ...

Plaintiff's Exh. 1.

■ 8. "Forgery" is defined in the bond as "the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose." Plaintiff's Exh. 1.

9. As the court has previously held, only Insuring Agreement (D)(1) potentially provides coverage for the losses from the forged lien waivers. The court previously found it irrelevant that there were no forgeries or alterations *of* the actual checks. Under the terms of the bond, coverage extends to any loss resulting directly from forgeries or alterations on or in the checks. The court also held it irrelevant that plaintiff received copies of the lien waivers after the funds were disbursed to EMI. Insuring Agreement (D)(1) refers to losses that are directly caused by forgeries or alterations of, on, or in the described documents. There is no requirement that the forgery or alteration have induced action or inaction on the part of the insured. *See* Memorandum and Order, June 20, 1991, Doc. 77.

10. To be covered under the terms of the bond, the plaintiff must show that (1) there were forgeries; and (2) that the forgeries were on the reverse of the original checks.

■ 11. Not all of the lien waivers received by CMC during the course of these dealings contained forged signatures. The signatures of Jeffrey Cagle on the checks made payable to Denovo, Inc. were not forged. *See* Defendant's Exh. C. Plaintiff is not claiming a loss as to any of the Denovo checks. As to all the checks for

which plaintiff is claiming a loss in this action, CMC received forged lien waivers back from EMI.

12. Plaintiff failed to prove by a preponderance of the evidence that the forged lien waivers were in fact on the reverse of the original checks made payable to the subcontractors. CMC never received the original subcontractor checks. CMC received what purported to be copies of the reverse sides of the checks, i.e., copies of the lien waivers. Six of the original subcontractor checks were negotiated by the subcontractors, but none of those six bore forged lien waivers. The other original checks were not produced at trial. Plaintiff has failed to prove that there were forgeries on or in those checks.

13. The forgeries most likely occurred on copies of the checks. As to the six checks that were negotiated, EMI provided forged copies of the lien waivers to CMC. As to the other checks, no proof was presented, since the originals have disappeared. As the originals are not in evidence, the court must conclude that the plaintiff failed to prove that the original checks bore forged endorsements/lien waivers.

14. Since plaintiff failed to prove that it suffered a loss directly from a forgery or alteration on or in any negotiable instrument, judgment must be entered in favor of the defendant.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered in favor of the defendant on all of plaintiff's claims.