**LAPEKA, INC., and Eldon V. Danenhauer, Plaintiffs,**

v.

**SECURITY NATIONAL INSURANCE COMPANY, INC., a Texas corporation, Defendant.**

**No. 91–4185–SAC.**

United States District Court, D. Kansas.

Feb. 12, 1993.

Dennis G. Hall, Dennis G. Hall, P.A., Topeka, KS, for plaintiffs.

William A. Larson, Gehrt & Roberts, Chartered, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

This case presents the issue of whether the defendant, Security National Insurance Company, Inc. (Security National), wrongfully failed to investigate, defend and provide coverage to the plaintiffs for an action against them in the United States District Court for the District of Kansas, titled *Lawson, et al, v. Lapeka, Inc., et al.*, Case No. 87–4018–R. In

that case, judgment was entered in favor of former Lapeka, Inc. (Lapeka) employees and against Lapeka and Eldon V. Danenhauer, the owner of Lapeka. This case comes before the court upon cross-motions for summary judgment. The parties agree that most of the facts are uncontroverted, and in large part the disposition of this case turns on the interpretation of the insurance policy issued by Security National.[1]

The court, having considered the briefs of the parties,[2] the uncontroverted facts, and the applicable law, is now prepared to rule. In ruling on these motions, the court has considered all of the arguments advanced by the parties, whether asserted in a motion for summary judgment or in response to a motion for summary judgment. For simplicity, the court has condensed and considered the arguments advanced by the parties at the same time.

### Standards for Summary Judgment

Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.*, 896 F.2d 474, 476–77 (10th Cir.1990).

If the moving party is able to show "an absence of evidence to support the non-moving party's case" *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, the burden then shifts to the non-moving party "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts that show a genuine issue for trial remains. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party's response must be supported by the kinds of evidentiary materials listed in Rule 56(c). *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Farnsworth v. Town of Pinedale, Wyoming*, 968 F.2d 1054, 1056 (10th Cir.1992). Rule 56 does not require "the moving party to support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.

### Uncontroverted Facts

Lapeka, Inc. (Lapeka), a corporation in good standing in the State of Kansas, is principally engaged in the business of distributing beer and wine in northeast Kansas. Eldon V. Danenhauer was at all relevant times President, Chairman of the Board of Directors, and sole stockholder of Lapeka, Inc. Denver Management Group, Inc. (DMG) is a Colorado corporation engaged in the business of management consultation with its principal place of business in Englewood, Colorado.

---

1. The parties do dispute the adequacy and timeliness of the notice of loss given by Lapeka to Security National. In light of the court's disposition of this case, it is unnecessary for the court to decide the issue of whether the plaintiffs provided adequate notice of loss.

2. The court notes that Security National repeatedly refers to the headnotes written by West Publishing Co. as the "syllabus" of the court. While some court opinions do include a "syllabus" which may constitute a portion of the court's opinion, the headnotes written by West Publishing *are not* part of the court's opinion and should not be cited as such. The headnotes are only intended to summarize the case and place the case into the Key Number system.

In July 1986, due to declining profitability, Lapeka retained DMG as a business management consultant to perform an operational analysis of all aspects of Lapeka's business. In August 1986, DMG's analysis was completed and reduced to written form. The DMG report contained a number of recommended changes, many of which Lapeka implemented. One of the recommendations made by DMG was a reduction in work-force, and DMG provided an evaluation matrix to assist in making the decision of which workers to terminate. In September 1986, Lapeka, relying on DMG's evaluation, terminated, amongst others, John H. Lawson, James L. Bean, Melvin W. Martin and Howard Wood. These employees were notified of their termination by Danenhauer.

Within ninety days of their termination, those four employees filed complaints with the Equal Opportunity Employment Commission (EEOC) and the Kansas Commission on Civil Rights (KCCR) claiming age discrimination by Lapeka. On October 16, 1986, the KCCR notified Lapeka that the Bean, Martin, Wood and Lawson had filed complaints with the KCCR alleging age discrimination. On November 11, 1986, Lapeka was informed that Michael W. Merriam represented the ex-employees, that EEOC complaints were also going to be filed and that litigation would be commenced in the event settlement negotiations were unsuccessful.

On January 15, 1987, those employees subsequently filed a civil action in the United States District Court for the District of Kansas, *Lawson, et al, v. Lapeka, Inc., et al., Case No. 87–4018–R [hereinafter Lawson].* The plaintiffs in *Lawson* claimed damages for age discrimination, loss of benefits, pain, embarrassment, humiliation and other relief against Lapeka.[3] On March 9, 1987, Lapeka filed an answer and third party complaint against DMG and against its representatives

Verno, Joslyn and Hjort individually. On December 30, 1987, Lawson, Wood, Martin and Bean filed a motion to amend their complaint to add Eldon Danenhauer as an individual defendant. On March 21, 1988, plaintiffs filed their first amended complaint, naming Danenhauer as an additional defendant.

On August 15, 1988, written notice of loss from Lapeka was received by Security National at its claims office in Topeka, Kansas, along with a copy of the plaintiffs' complaint and first amended complaint.[4] The notice of loss referred to Policy # TTO 3800181. The comprehensive general liability insurance policy issued by Security National provided coverage to Lapeka from June 1, 1986, to June 1, 1987. The parties have supplied the court with copies of the insurance policy; the policy also includes additional endorsements. The relevant portions of the policy will be discussed in the analysis portion of this opinion.

On August 17, 1988, the defendants in *Lawson* filed for summary judgment. On September 20, 1988, Security National, by a letter sent to Lapeka's attorney Dennis Hall, declined coverage. On May 31, 1990, Lapeka attorney Hall renewed the demand for defense and indemnity. Hall also sent Security National a copy of the Pretrial Order, Settlement Proposal, and an ABA article dealing with insurance coverage of employee claims against employers as proof of his position that coverage under the insurance policy had been triggered.

On June 14, 1990, Security National again declined coverage. On November 5, 1990, third party defendant DMG was dismissed with prejudice as the result of its settlement stipulation with Lapeka and payment by DMG of $25,000.

On January 2, 1991, the jury trial in *Lawson* commenced. The court instructed the

---

**3.** The plaintiffs sought damages for pain, suffering and humiliation under K.S.A. 1991 Supp. 44–1005(k).

**4.** The plaintiffs contend that Danenhauer timely notified Howard C. (Buzz) Evans, an agent of Security National, of the complaints filed by the *Lawson* plaintiffs with administrative agencies and the filing of the civil action in the United States District Court. Security National con-

tends that the first written notice, dated August 15, 1988, was reported on August 18, 1988. Security National contends that the policy requires immediate written notice of the loss and that suit papers be forwarded immediately, procedures with which the plaintiffs failed to comply. Security National also contends that oral notice, even if given, is irrelevant in light of the terms of the insurance contract.

jury, inter alia, under a disparate impact theory. On January 15, 1991, the jury returned its special verdict, finding:

1) Lapeka and Danenhauer had discriminated against all four plaintiffs because of their age;

2) Neither Lapeka nor Danenhauer discharged Wood for the purpose of interfering with attainment of his rights under the pension plan;

3) Lapeka had breached an implied contract of employment with each of the four plaintiffs;

4) Each of the four plaintiffs was entitled to damages in the amount of $48,000 for back pay and benefits;

5) Each of the four plaintiffs was entitled to damages in the amount of $1,000 for pain, suffering and humiliation from Lapeka;

6) Each of the four plaintiffs was entitled to damages in the amount of $1,000 for pain, suffering and humiliation from Danenhauer;

7) Neither Lapeka's nor Danenhauer's conduct was willful.

On January 15, 1991, a judgment was entered in accordance with the jury's verdict, each plaintiff recovering from Lapeka and Danenhauer the sum of $50,000, for a total of $200,000 plus interest and costs, which equaled $200,382.70 with interest at payment.

On March 19, 1991, the court in *Lapeka* denied plaintiffs' request for injunctive relief, but granted the plaintiffs' claim for attorneys' fees and expenses in the amount of $161,151.27. In defense of the *Lawson* case, Lapeka and Danenhauer incurred attorney fees and expenses in the amount of $164,074.22. In the pretrial order, the parties have stipulated that the plaintiffs have paid the total sum of $526,608.19 in relation to the judgment, attorney's fees, interest, expenses and expert witness fees in *Lawson*.

After the jury's verdict, Lapeka, by its attorney Hall, made demand for indemnity based upon the judgment in *Lapeka*. Security National declined and Lapeka subsequently commenced this action.

### Arguments of the Parties

The plaintiffs contend that Security National breached its duty to defend and duty to indemnify. Specifically, the plaintiffs contend that Security National's cursory review of the claims and subsequent denial of coverage are inconsistent with the language of the policy and the law interpreting similar insurance policies. Conversely, Security National contends that it had neither a duty to defend nor a duty to indemnify under the terms of the insurance policy. Security National also contends that the plaintiffs failed to provide timely written notice of loss as required by the policy.

■ An insurance policy is a contract. *Chance v. The Farm Bureau Mut. Ins. Co., Inc.*, 756 F.Supp. 1440, 1442 (D.Kan.1991). "The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties." *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992). "In determining the intention of the parties, the subjective or undisclosed intent of the insurer does not control interpretation of the policy." *Westchester Fire Ins. Co. v. City of Pittsburg, Kan.*, 768 F.Supp. 1463, 1467 (D.Kan.1991), *reconsideration denied*, 794 F.Supp. 353 (D.Kan.1992). Insurance contracts must be considered as a whole. *Scott v. Keever*, 212 Kan. 719, 723, 512 P.2d 346 (1973). Contract terms should be read as a reasonable person in the insured's position would have understood them. *Farm Bureau Mut. Ins. Co. v. Winters*, 14 Kan.App.2d 623, 626, 797 P.2d 885 (1990).

■ The insurer has an affirmative duty to define coverage limitations in clear and explicit terms. *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 900, 522 P.2d 401 (1974); *see Raymer*, 251 Kan. at 693, 840 P.2d 456 ("Since the insurer prepares its own contracts, it has a duty to make the meaning clear."). "If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured." *Raymer*, 251 Kan. at 693, 840 P.2d 456. "This rule of construction applies with particular force to

provisions which attempt to exclude liability coverage under certain circumstances." *Westchester*, 768 F.Supp. at 1467. *See Krug v. Millers' Mutual Insurance Ass'n*, 209 Kan. 111, Syl. ¶ 2, 495 P.2d 949 (1972) ("Exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage though broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms.").

■ An insurance contract is generally liberally construed against the insurer. *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 36, 744 P.2d 840 (1987); *see Carriers Ins. Co. v. American Home Assur. Co.*, 512 F.2d 360, 362 (10th Cir.1975).

> The purpose of the "construed against the insurer" rule, however, is not to predetermine disputes but only to assist the court in determining the intent of the parties to the contract. *Liberty Mutual Ins. Co. v. Allied Mutual Ins. Co.*, 442 F.2d 1151 (10th Cir.1971). The basis for construing an insurance policy against the insurer in close cases is simply the rule of contracts that the drafter must suffer the consequences of not making the terms clear. (citations omitted).

*Lightner*, 242 Kan. at 36, 744 P.2d 840. "When an insurance contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made." *Raymer*, 251 Kan. at 693, 744 P.2d 840; *Central Sec. Mut. Ins. Co. v. DePinto*, 235 Kan. 331, 681 P.2d 15 (1984) (plain and unambiguous policies must be given their plain meaning). "A court 'will not torture words in order to import ambiguity where the ordinary meaning leaves not room for ambiguity.'" *Farm Bureau Mut. Ins.*, 14 Kan.App.2d at 626, 797 P.2d 885 (quoting *Eddy v. Travelers Ins. Co., Hartford, Conn.*, 212 F.2d 518, 520 (10th Cir.1954)), *aff'd*, 248 Kan. 295, 806 P.2d 993 (1991).

In *Westchester*, Judge O'Connor summarized the issues relevant to burden of proof:

> As to the burden of proof, the well-established rule is that when an insurer seeks to avoid liability on the ground that the accident or injury for which compensation is demanded is covered by some specific exception to the general terms of the policy, *the burden of proof rests upon the insurer* to prove the facts which bring the case within such specific exception. *Dronge v. Monarch Ins. Co. of Ohio, supra*, 511 F.Supp. [1] at 4–5 [ (D.Kan.1979) ] (emphasis added). The burden is on the insured to prove that the loss was of a type included in the general coverage provisions of the insurance contract. *Id.* at 5; *Golf Course Superintendents Ass'n of Am. v. Underwriters at Lloyd's, London*, 761 F.Supp. 1485, at 1489 (D.Kan.1991). Thus, the distinction between "coverage" provisions and exculpating or "exclusionary" clauses in an insurance contract is the decisive factor in determining which party has the burden of proof on an issue, where coverage under the policy is in dispute. *Id.; Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 900, 522 P.2d 401, 409–10 (1974); *Millers' Mut. Ins. Ass'n, supra*, 209 Kan. at 117–18, 495 P.2d at 954–55.

768 F.Supp. at 1468; *see Golf Course Superintendents Ass'n v. Underwriters*, 761 F.Supp. 1485, 1489 (D.Kan.1991) (same).

### Duty of an Insurer

Under an insurance policy, the insurer assumes a duty to defend and a duty to pay proceeds. The duty to defend and the duty to indemnify are not necessarily co-extensive. *State Farm Fire & Casualty Co. v. Finney*, 244 Kan. 545, 553, 770 P.2d 460 (1989).

An insurer's duty to defend is broader than its duty to indemnify. *Western Chain Co. v. American Mut. Liab. Ins. Co.*, 527 F.2d 986, 989 (7th Cir.1975). Because an insurer must defend an action if there is the potential of liability under its policy, *Spruill Motors, Inc. v. Universal Underwriters Insurance Co.*, 212 Kan. 681, 512 P.2d 403, 407 (1973), it has a duty to defend actions that may not ultimately result in an obligation to indemnify. *See Solo Cup Co. v. Federal Ins. Co.*, 619 F.2d 1178, 1184 (7th Cir.), *cert. denied*, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). *Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476, 1484 (10th Cir.1991). "So long as the

insured can show a non-frivolous possibility that the claim against it may fall within the coverage of the insurance contract, the insurer has a duty to defend the insured." *American Motorists Ins. Co. v. General Host Corp.*, 946 F.2d 1489, 1490 (10th Cir.1991).

In determining whether the insured has a duty to defend, it is by now well-recognized that "we must examine the complaints in the[ ] underlying actions and decide whether there are any allegations that arguable or potentially bring the action within the protection purchased or a reasonable possibility that coverage exists." *EAD Metallurgical, Inc. v. Aetna Casualty & Surety Co.*, 905 F.2d 8, 11 (2d Cir. 1990). Some courts additionally "look beyond the effect of the pleadings and ... consider any facts ... which [the insurer] could reasonably discover in determining whether it has a duty to defend." *Spruill Motors, Inc. v. Universal Underwriters Insurance Co.*, 212 Kan. 681, 512 P.2d 403, 407 (1973) (citations omitted).

*Id.*

The court will first consider whether Security National was obligated to defend the plaintiffs pursuant to its contract of insurance and then consider whether Security National is obligated to indemnify the plaintiffs for their loss.

Disparate Impact and Disparate Treatment

As a precursor to understanding the issues presented in this case, it is necessary to understand the methods of proving age discrimination. Age discrimination may be proven under either a disparate treatment or disparate impact theory. *See MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119 (10th Cir.1991). "Disparate treatment occurs where 'the employer simply treats some people less favorably than others' because of their sex or other protected status." *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1236 (10th Cir.1991) (quoting *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir.1991) (quoting *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 448 (10th Cir.1981) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977)))). When alleging disparate treat-

ment, the plaintiff must prove by a preponderance of the evidence that the defendant had a discriminatory motive or intent. *Id.*

In comparison, a "claim of disparate impact exists when 'employment practices that are basically neutral in their treatment of different groups in fact fall more harshly on one group than another....'" *Id.* "A claim of disparate impact, unlike a claim of disparate treatment, does not require a finding of intentional discrimination. Indeed, "the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Id.* at 1242 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988)).

Occurrence

The first issue is whether the plaintiffs have demonstrated the claims made in *Lawson* are claims that fall within the coverage of the insurance policy issued by Security National.

In pertinent part, the insurance policy reads as follows:

The company will pay on behalf of the **insured** all sums which the insured shall become legally obligated to pay as damages because of

A. **bodily injury** or

B. **property damage**

to which this insurance applies, caused by an **occurrence,** and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such **bodily injury** or **property damage,** even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defendant any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

The term "occurrence" means "an accident, including continuous or repeated expo-

sure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Security National, relying in large part upon California cases, contends that a termination of an employee is not an "occurrence" within the meaning of the policy. Specifically, Security National contends that Lapeka's termination of the employees was not "accidental," but was instead the result of an intentional act, i.e., a decision to terminate those employees.

The plaintiffs respond that the cases cited by the defendant, particularly the California cases, are decisions based upon state law, not federal discrimination law. The plaintiffs contend that a disparate impact case, as opposed to a disparate treatment case, involves intentional actions and unintended effects. The plaintiffs contend that the unintentional nature of disparate impact cases stemming from the employee's terminations is no different that the act of driving an automobile, "both of which can and do result in unintended or unexpected injury."

As the plaintiffs suggest, the California cases cited by Security National appear to turn on California law. In fact, one of the cases cited by Security National actually explains that the law of California is distinguishable from the law of other jurisdictions.

Wilson contends that because she need not allege intent to discriminate on her disparate impact claim, it does not allege a purposeful act excluded from coverage under Vista's policy. She cites *Solo Cup Co. v. Federal Ins. Co.,* a Seventh circuit case applying Illinois law. 619 F.2d 1178 (1980). However, the result in *Solo Cup* does not state the result under California law. California courts have focused not on whether the claim requires proof of intent or proof of negligence (the focus of the *Solo Cup* analysis) but rather have looked at whether the alleged act giving rise to damages is purposeful. *See, e.g., Commercial Union Ins. v. Superior Court,* 196 Cal.App.3d 1205, 1209, 242 Cal.Rptr. 454 (1st Dist.1987) (act of discharging employee is intentional and so not covered); *St. Paul Fire & Marine Ins. v. Superior Court,* 161 Cal.App.3d 1199, 1202, 208 Cal. Rptr. 5, 7 (3d Dist.1984) (same); *Hartford Fire Ins. Co. v. Karavan Enter.,* 659 F.Supp. 1075, 1076 (N.D.Cal.1986) (allegation that though act intended, harm was not, did not create potential of liability under policy). Where the act of giving rise to damages was intentional, the California courts have rejected the argument that while the act was intentional, the damages were not, and thus should be covered under the policy.

*American Guar. & Liability v. Vista Medical Supply,* 699 F.Supp. 787, 791–92 (N.D.Cal.1988). Therefore, those cases are only helpful if the law of Kansas has similarly interpreted the phrase "occurrence."

■ In *Spruill,* the insurer argued that it did not have a duty to defend or indemnify its insured because the insured's employees' actions were wrongful and intentional and thus not covered by the policy. The policy defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." 212 Kan. at 684, 512 P.2d 403. The Supreme Court of Kansas rejected that argument and concluded that the "provisions of a liability insurance policy which include liability for an accident which results in bodily injury or property damage 'neither expected nor intended from the standpoint of the insured' is construed to provide coverage for an unintended injury resulting from an intentional act." 212 Kan. 681, Syl. ¶ 5, 512 P.2d 403. *See United States Fidelity & Guaranty Co. v. Morrison Grain Co.,* 734 F.Supp. 437 (D.Kan.1990) (discussing *Spruill* and subsequent Kansas case law). In light of this case law from Kansas, the California cases cited by Security National are not particularly instructive.

■ In *Lawson,* the jury was clearly instructed, in part, upon a disparate impact theory. *See* Jury Instruction Number 10. Therefore the issue is whether conduct giving rise to a disparate impact claim qualifies as an "occurrence" within the meaning of the policy.

This precise issue has apparently not been decided in Kansas. In *Golf Course Superintendents Ass'n*, Judge Rogers held that an insurance policy which limited its coverage of "wrongful acts" to negligent acts, negligent errors, negligent omissions, negligent misrepresentations and negligent misleading statements did not cover the intentional retaliatory conduct of the insured which gave rise to the plaintiff's 42 U.S.C. § 1981 claims.[5] In reaching that decision, the court noted that "[t]here is no claim of disparate impact." 761 F.Supp. at 1491.

> First, we note that our construction of the policy does not bar coverage of *all* discrimination claims; claims of discriminatory impact, as opposed to discriminatory treatment, could still be covered. *See Solo Cup Co. v. Federal Ins. Co., supra; School Dist. No. 1 v. Mission Insurance Co.,* [58 Or.App. 692, 650 P.2d 929], *supra.* Therefore, it is possible for the parties to intend to exclude coverage of claims of intentional conduct, without intending to exclude coverage of all future claims of discrimination.

761 F.Supp. at 1490. *See Solo Cup Co.,* 619 F.2d at 1187 (disparate impact claim was a claim potentially covered under the policy).

In light of Kansas case law, this court concludes that a disparate impact claim could qualify as an "occurrence" within the definition of the policy. This conclusion, however, does not automatically entitle the plaintiffs to coverage. The court must now consider whether the plaintiffs in *Lawson* claimed damages that were covered by the policy.

### Bodily Injury

■ The policy defines "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."

Security National contends that none of the plaintiffs in *Lawson* claimed any damages which would qualify as "bodily injury" within the meaning of the policy. The plaintiffs contend that the plaintiffs in *Lawson* claimed that they suffered pain, humiliation and embarrassment due to their discriminatory termination. The plaintiffs contend that

the emotional distress caused by the trauma of wrongful termination may be severe enough to manifest itself in the form of physical injury or may actually result in physical injury. The plaintiffs then argue that emotional distress may itself be bodily injury or cause bodily injury.

Having considered all of the evidence presented, including a partial transcript from the *Lawson* case, the court concludes that the *Lawson* plaintiffs did not allege any claim which would constitute a claim for "bodily injury" within the meaning of the insurance policy. *See St. Paul Fire & Marine Ins. v. Campbell Cty. School,* 612 F.Supp. 285, 287 (D.C.Wyo.1985) (emotional suffering does not constitute bodily injury); *University of Illinois v. Continental Cas.,* 234 Ill.App.3d 340, 175 Ill.Dec. 324, 339, 599 N.E.2d 1338, 1353 (4 Dist.1992) (phrase "bodily injury" restricted to mean "actual physical injury" as opposed to broadening it to include mental anguish and mental disease); *Dahlke v. State Farm Mut. Auto Ins. Co.,* 451 N.W.2d 813, 815 (Iowa 1990) (summarizing several cases denying coverage for mental and emotional distress and holding that psychological and physical effects on insured's arising out their son's death in car collision are not "bodily injuries" within the meaning of the insurance policy); *National Ben Franklin Ins. Co. of Mich. v. Harris,* 161 Mich.App. 86, 409 N.W.2d 733, 735 (1987) (phrase "bodily injury" is unambiguous and does not include humiliation and mental anguish and mental suffering; at a minimum, it would require physical manifestation of mental suffering to satisfy the bodily injury requirement); *Mutual Serv. Cas. Ins. v. Co-op Supply, Inc.,* 699 F.Supp. 1438, 1440 (D.Mont.1988) (former employee's claims against insured alleging pain, suffering and humiliation and mental and emotional distress did not trigger the insurer's duty to defend, however employee's specific allegation of "bodily injury" triggers duty to defend); *Hamlin v. Western Nat. Mut. Ins. Co.,* 461 N.W.2d 395, 397 (Minn. App.1990) (prevailing view is that phrase "bodily injury, sickness or disease" does not include mental harm); *Bowman v. Holcomb,* Case No. CA92–05–088, 1992 WL 333577,

---

**5.** Claims under § 1981 require proof of intentional discrimination. 761 F.Supp. at 1491.

1992 Ohio App. LEXIS 5766 (November 16, 1992) (phrase "bodily injury" limited to physical injuries and excludes claims for emotional distress); *E–Z Loader Boat Trailers v. Travelers Indem.*, 106 Wash.2d 901, 726 P.2d 439, 443 (1986) (emotional distress, mental anguish and illness, are not bodily injury within the meaning of the insurance policy); *but see SL Industries, Inc. v. American Motorists Ins. Co.*, 128 N.J. 188, 204, 607 A.2d 1266 (1992) (phrase "bodily injury" should be analyzed on a case-by-case basis to determine whether the alleged injuries are sufficiently akin to physical injuries to render the term "bodily injury" ambiguous; the phrase "bodily injury" is not ambiguous in the context of purely emotional injuries without physical manifestations).

The type of injuries alleged simply did not fall within the definition of "bodily injury" coverage of the policy.

### Property Damage

■ The policy defines "property damage" as (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an *occurrence* during the policy period.

Security National contends that none of the plaintiffs in *Lawson* claimed property damage within the meaning of policy. Specifically, Security National contends that no "tangible property" was damaged or claimed to have been damaged.

In response, the plaintiffs contend that the plaintiffs in *Lawson* claimed that Lapeka had breached an implied contract of employment. The plaintiffs contend that an implied contract of employment is "tangible property" within the meaning of the insurance policy.

The court concludes that an implied contract of employment is not "tangible property" within the meaning of the insurance policy. In general, tangible property means "property that has physical form and substance and is not intangible. That which may be felt or touched, and is necessarily corporeal, although it may be either real or

personal (e.g. ring or watch)." *Black's Law Dictionary* 1456 (6th ed. 1990). In *Mutual Serv. Cas. Ins.*, 699 F.Supp. at 1441–1442, the court held that an employee's claims for past and future salary, loss of health benefits, and other benefits of employment are not "tangible property" within the meaning of an insurance policy which defined "tangible property" similarly to the definition in the policy issued by Security National. None of the case law cited by the plaintiffs involved the interpretation of the phrase "tangible property" as found in a contract of insurance.

Security National did not have a duty to defend under this section of the insurance policy.

### Personal Injury Coverage

■ The plaintiffs contend that Security National was obligated to defend under the "Personal Injury and Advertising Injury Liability Coverage" portion of the policy. The plaintiffs contend that the policy is ambiguous as it lists coverage arising out of certain torts, but does not specifically limit coverage to those torts. The plaintiffs also contend that the use of the term "additional definitions" creates an ambiguity. The plaintiffs contend that the policy covered both unintentional and intentional discrimination and wrongful conduct.

In response, Security National contends that none of the claims made by the plaintiffs in *Lawson* fall within the definition of personal injury. Security National contends that the policy is not ambiguous and that this provision does not provide the expansive coverage asserted by the plaintiffs.

The policy list certain torts which are covered by the policy. The court agrees that there is nothing in this provision that is ambiguous or that would otherwise provide coverage for the injuries claimed by the plaintiffs in *Lawson*. Security National did not owe a duty to defend or indemnify under this provision of the policy.

### Contract Coverage

■ In a one-half page discussion, the plaintiffs contend that a provision providing "Contractual Liability Coverage" clearly established Security National's duty to defend and indemnify.

1550

In pertinent part, that portion of the policy provides:

**Exclusions**

This insurance does not apply:

(a) to liability assumed by the **insured** under any contract or agreement except an **incidental contract** ...

.    .    .    .    .

"Incidental Contract" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement. The Broad Form General Liability Endorsement modifies this definition in the following manner:

1. CONTRACTUAL LIABILITY COVERAGE

(A) The definition of **incidental contract** is extended to include any oral or written contract or agreement relating to the conduct of the named insured's business.

Security National first observes that this claim for coverage does not appear in the pretrial order and therefore not proper for the plaintiffs to assert. In any event, Security National contends that this portion of the policy creates neither a duty to defend nor a duty to indemnify. Instead, Security National contends that this portion of the policy only applies to contracts under which the insured assumes the liability of another. Therefore, this provision has no application to case at bar.

Security National appears to have correctly construed this provision of the policy. In *Commercial Union Ins. v. Basic American Medical,* 703 F.Supp. 629, 633 (E.D.Mich. 1989), the court construed a provision in an insurance contract similar to the one contained in the policy issued by Security National. The court commented:

I agree that Hahn and Hutchinson's employment contracts do not constitute covered "incidental" contracts. To fall within this provision, a contract must not only be incidental; the policy also requires that the

contract be one in which the insured assumes liability. This incidental contract exception to the general exclusion would otherwise create coverage for all incidental contracts. However, exclusionary clauses such as this can never create coverage. *Fresard v. Michigan Millers,* 414 Mich. 686, 697, 327 N.W.2d 286 (1982). They limit the scope of the basic protection statement. *Id.* The Alaska Supreme Court also reached this conclusion when it interpreted the same insurance policy language. *Olympic, Inc. v. Providence Washington Insurance Company of Alaska,* 648 P.2d 1008, 1010 (Alaska 1982).

The phrase "liability assumed by the insured under any contract or agreement" does not refer to the type of liability incurred as a result of the breach of every contract. This phrase refers to a narrower class of contract liability:

Liability insurance policies not infrequently contain provisions specifically excluding from coverage liability assumed by the insured under a contract not defined in the policy. Such provisions, which may be referred to as "contractual exclusion clauses," deny the coverage generally assumed by a liability policy in cases in which the insured in a contract with a third party agrees to same harmless or indemnify such third party.

12 *Couch on Insurance* § 44A:35 at p. 55 (2nd Ed.1981). *See also Western Fire Insurance v. Snyder, Inc.,* 76 Mich.App. 242, 249, 256 N.W.2d 451 (1977). The purpose of these contractual exclusion clauses is not to make the insurer underwrite its insureds' contracts, but to limit coverage to the insured's tort liability. 12 Couch, *supra,* § 44A:36, at p. 57.

*See Loyola Marymount University v. Hartford Acc. & Indem.,* 219 Cal.App.3d 1217, 271 Cal.Rptr. 528 (Cal.App. 2 Dist.1990).

Therefore, this provision of the policy does not create an obligation to defend or indemnify in the case at bar.

**Benefit Endorsement**

The plaintiffs in *Lawson* also claimed damages for loss of fringe benefits

including sick leave, vacation, medical and dental insurance and retirement plans. The plaintiffs in the case at bar claim coverage under the "Employee Benefit Programs Liability Endorsement," which provides:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any negligent act or omission of the insured, or of any other person for whose acts the insured is legally liable, if such negligent act or omission is committed in the administration of the named insured's employee benefit program, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such loss, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

. . . .

When used in reference to this insurance: "Employee benefit program" means the following plans:

(a) group life insurance, group accident or health insurance, profit sharing plans, pension plans and stock subscription plans, provided that no one other than an employee may subscribe to such insurance or plans;

(b) unemployment insurance, social security benefits, workers' compensation and disability benefits;

(c) any other similar plan designated in the Schedule or added thereto by endorsement;

"Administration" means

(a) counseling employees, including their dependents and beneficiaries, with respect to the employee benefit program;

(b) handling records in connections with the employee benefit program; or

(c) effecting or terminating any employee's participation in a plan included in the employee benefit program. . . .

Security National claims that this provision is, by its terms, inapplicable to the case at bar. Specifically, Security National contends that "it is patently obvious that the termination of the four employees was not an act committed in 'the administration of the named insured's employee benefit program." Moreover, even if the terminations of the four employees somehow falls within that definition, Lapeka and Danenhauer's actions were not negligent, but were instead intentional acts to cut costs. The policy excludes, inter alia, coverage for "bodily injury, property damage or personal injury."

The plaintiffs have failed to demonstrate that this provision applies to the case at bar under the uncontroverted facts. The court essentially agrees with Security National's analysis of this portion of the policy. Security National had no duty to defend under this portion of the policy.

### Summary

In sum, the court concludes that Security National did not have a duty to defend or a duty to indemnify the plaintiffs for their losses associated with the claims and expenses connected with the *Lawson* case.

### Other Defenses of the Insurer

In light of the court's ruling it is unnecessary for the court to consider Security National's arguments pertaining to the exclusions found in the policy as well as its argument concerning untimely notice.

IT IS THEREFORE ORDERED that Security National's motion for summary judgment (Dk. 44) is granted.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment (Dk. 43) is denied.