Donohue, J.
This case is an insurance coverage dispute between the plaintiff policy holder Wyman-Gordon Co. (“Wyman”) and the defendant insurer Liberty Mutual Fire Insurance Co. (“Liberty”). This matter is before the court on the parties’ cross motions for partial summary judgment on the issue of liability pursuant to Mass.R.Civ.P. 56(c). For the following reasons, Wyman’s motion is ALLOWED and Liberty’s motion is ALLOWED IN PART.
FACTUAL BACKGROUND
I. The Underlying Claims:
In 1991, Wyman, a defense contracting corporation, was experiencing financial difficulties. As part of their efforts to address such difficulties, Wyman brought in a new management team which, among other efforts, secured the services of William M. Mercer, Inc., a benefits planning consultant to analyze the company’s liabilities arising from its employee benefits programs. Based at least in part on that advice, Wyman announced to its retired employees on December 28, 1992, that they would have to contribute to the employee benefits programs in order to maintain their benefits.
This decision to cut retiree benefits resulted in two class action lawsuits on behalf of the retirees. The first, Garganigo et al. v. Wyman-Gordon Co., C.A. No. 93-40042 (U.S. Dist. Ct., D.Mass.), was filed in Massachusetts on or about March 2, 1993 (the “Massachusetts suit”). The complaint in this suit contained two principle counts: (1) breach of contract [the retiree reinsurance plan] in violation of the Employee Retirement Income Security Act of 1974 (“ERISA”), 29 U.S.C. § 1002( 1); and (2) breach of contract [the underlying collective bargaining agreements]. A final settlement was entered into in the Massachusetts suit in December 1995. That settlement provided that Wyman would: (1) reimburse specific plaintiffs who had been promised lifetime health care benefits in settlement of unrelated disability claims for their out of pocket health care costs; (2) fund health care benefits at a higher level than provided for in Wyman’s December 28, 1992 announcement of reduction of benefits; and (3) pay the plaintiffs’ attorneys fees incurred in achieving this settlement.
The second, Beach et al v. Wyman Gordon Co., Case No. 93 CV 71822 (U.S. Dist. Ct., E.D.Mich.), was filed in Michigan on or about April 30, 1993 (the “Michigan suit”). This suit contained five counts: (1) and (2) breach of contract in violation of the Labor Management Relations Act (“LMRA”) 29 U.S.C. §185; (3) and (4) violations of an employee benefit welfare plan in violation of ERISA, 29 U.S.C. §1002(1); and (5) estop-pel. This complaint specifically stated a prayer for *772 relief in the form of damages for “mental distress and anguish.” A final settlement was entered into in the Michigan suit in September 1994. That settlement provided that Wyman would: (1) reimburse the plaintiffs for their out of pocket costs associated with health care benefits; (2) fund the health care benefits of the retiree class at a higher level than provided for in Wyman’s December 28, 1992 announcement of reduction in benefits; and (3) pay the class plaintiffs’ attorneys fees incurred in achieving the settlement.
Neither settlement specifically apportioned the amounts awarded to the plaintiffs to account for emotional or mental distress damages.
II. The Policy
At the time the two class action suits were initiated, Wyman was the holder of a commercial general liability insurance policy that Liberty had issued. There are two basic provisions which Wyman argues gave rise both to Liberty’s duty to defend and duty to indemnity. First, the policy contains an Employee Benefits Liability Insurance endorsement (“EBLI”), which reads:
A. Insuring Agreement-Employee Benefits Liability
1. We will pay those sums for which the “insured” becomes legally obligated to pay as damages because of the injury to the rights or interests of employees or their beneficiaries in “employee benefits programs” to which this insurance applies caused by any improper advice, error or omission in the “administration” of such programs.
As used in the above endorsement, “administration” is defined as follows:
D. Definitions
1. “Administration” means the determination of the eligibility of employees to participate in the “employee benefits programs,” the enrollment of employees in those programs, the keeping of records pertaining to those programs, the interpreting of the provisions of those programs and the giving of advice or counsel to employees or their beneficiaries as to their rights or interest in those programs.
As to the scope of EBLI coverage afforded, as described in the provision above, the policy contains one material exclusion:
B. Exclusions
This insurance does not apply to . . .
3. Any claim based on your failure (whether in the capacity of self-insurer or otherwise) or the failure of any insurer to pay or provide the benefits allegedly due under any contract relating to employee benefits programs;
Second, the policy provides for general liability coverage for:
. . . those sums that the insured becomes legally obligated to pay as damages because of “bodily injury” or “property damage” to which this insurance applies.
“Bodily injury” was replaced in all material respects by an amendatory endorsement to the policy by the term “Personal injury,” which includes:
. . . Injury'to the feelings or reputation of a natural person . . .
The policy’s provision relating to the insured’s requirement to notify the insurer states:
If a claim is made or “suit” brought against any insured, you must:
(1) Immediately record the specifics of the claim or “suit” and the date received; and
(2) Notify us as soon as practicable.
You and any other involved insured must:
(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or “suit”; . . .
No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.
III. The Coverage Claims:
Wyman formally notified Liberty of both suits in a letter from Wyman’s risk manager dated December 14, 1993. On January 11, 1994, Liberty notified Wyman that it would decline to defend or indemnify Wyman on the Massachusetts suit. On or about May 12, 1994, Liberty notified Wyman that it had determined the Michigan suit stated a covered claim under the “personal injury” provision of the policy, specifically because that complaint sought damages for emotional distress, or “hurt feelings” and that therefore Liberty would provide a defense. Liberty specifically reserved its rights to withdraw from the defense in the event that the claims for emotional distress were removed from the suit.
DISCUSSION
I. Summary Judgment Standard:
Summary judgment is appropriate when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56; Kourouvacilis v. General Motors Corp., 410 Mass. 706 (1991), citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The non-moving party cannot merely rest on its pleadings in order to establish a disputed issue of material fact; it is necessary to respond with specific admissible evidence to establish a triable issue of fact. Mass.R.Civ.P. 56(e); Pederson v. Time, Inc., 404 Mass 14, 17 (1989).
II. Liberty’s Duty to Defend:
A. Policy Construction:
The interpretation of an insurance policy in undisputed factual circumstances is a matter of law to be decided by the court. Somerset Savings Bank v. Chi *773 cago Title Ins. Co., 420 Mass. 422, 427 (1995). The unambiguous language in an insurance contract is to be construed according to its plain meaning. Jacobs v. United States Fidelity & Guaranty Co., 417 Mass. 75, 76-77 (1994). Should that language be ambiguous it is to be construed against the insurance company and in favor of the insured. Preferred Mut. Ins. Co. v. Gamache, 42 Mass.App.Ct. 194, 198 (1997), citing Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83 (1984).
In order to determine whether a specific policy provision requires an insurance company to defend its insured against a third-party suit, it is necessary to match the third-party complaint with the policy provisions. Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146 (1984), citing Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. 316, 318 (1983). If the allegations of the complaint are “reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense.” Sterilite, 17 Mass.App.Ct. at 318. Furthermore, even if a complaint on its face does not appear to fall within the ambit of policy coverage, the insurer may have a duty to defend if additional facts are known or available to it that suggest the claim is covered. See Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10-11(1989).
1. EBLI Coverage:
The court rules that both the Massachusetts and Michigan suits triggered the duty of Liberty to defend Wyman based on the plain meaning of the EBLI coverage provision. Liberty argues that the EBLI provision does not, by its terms, provide coverage for either suit for three principle reasons, each of which the court rejects.
First, Liberty argues that the Massachusetts suit did not allege any injury that was caused by any conduct in the “administration" of “employee benefits programs.” It contends that the definition of “administration,” supra, is limited to clerical or ministerial mistakes in administering the plan with respect to individual employees, not to corporate level decision making that changes the scope of benefits available to an entire class of employees. In support of this argument, Liberty relies on three federal cases. See Maryland Cas. Co. v. Economy Bookbinding Corp. Pension Plan and Trust, 621 F.Supp. 410 (D.N.J. 1985); Lapeka, Inc., v. Security Nat'l. Ins. Co., 814 F.Supp. 1540, 1551 (D.Kan. 1993); Bendis v. Hartford Accident and Indem. Co., Nos. 90-2198, 91-2192, 1993 WL 463617 (D.Kan. Sept. 16, 1993). The court does not agree that these cases are persuasive in construing the meaning of the provisions at issue here.
Maryland Casualty held that investment decisions of corporate officers did not fall under the meaning of administration as defined in the policy at issue there. Maryland Casualty, supra, at 413. However, the policy definition of “administration” in Maryland was somewhat narrower than the policy here, which additionally includes in the definition of “administration”: “the determination of the eligibility of employees to participate in the employee benefits programs.” Lapeka held that the termination of four employees was similarly not an act of “administration of the . . . employee benefits program.” Lapeka, supra, at 1551. Again, the policy there contained no language covering errors or omissions arising from a determination of the eligibility of employees to participate in a benefits program. The policy in Bendis, supra, similarly contained no provision regarding eligibility determination.
Indirectly, Liberty argues that regardless of what acts these cases hold do not fall within a similar definition of administration, there should be no coverage for errors in the administration of benefits programs where those acts are intentional rather than negligent. Specifically, it contends that Wyman’s decision to modify retiree benefits was not the result of “improper advice, error or omission,” but was an intentional, knowing and certain breach of contract. Consequently, Liberty concludes, the corporate decision was a known certainty of loss that contravenes the insurance principle of fortuity. See SCA Services, Inc. v. Transportation Ins. Co., 419 Mass. 528, 532 (1995). The record does not support any conclusion that Wyman’s decision to modify employee benefits was intentional in the sense that Wyman knew for a certainty either that it was definitively breaching an existing contract or that it would be sued, successfully, by a disgruntled class of retirees.[1] Wyman has offered admissible evidence in support of the fact that although Wyman had a policy under which it reserved the right to modify benefits, it had failed to inform employees of such right. Liberty’s reliance in opposition on the deposition testimony of Wyman’s general counsel is not to the contrary. Had Liberty wished to exclude the type of risk that Wyman undertook, it could have drafted the policy to do so.
As discussed, the court concludes that both the Massachusetts and Michigan suits were within the scope of the policy coverage under the plain meaning of the EBLI endorsement. Assuming, arguendo, that the EBLI provision may be susceptible to two reasonable meanings, thus ambiguous, the court would resolve such ambiguity against the insurer and in favor of the insured. See Preferred Mut. Ins. Co. v. Gamache, 42 Mass.App.Ct. at 198.
For these reasons, on the issue of whether Liberty had a duty to defend Wyman in the Massachusetts suit on the basis of coverage arising from the EBLI endorsement, Wyman’s motion for summary judgment must be allowed, absent the applicability of any exclusion, as discussed below.
2. Applicability of the EBLI Exclusion:
Liberty asserts that one of the exclusions to the EBLI coverage provision, supra, entitles it to summary *774 judgment on the issue of whether the EBLI provision provides coverage here. In essence, it argues that Wyman’s decision to modify benefits was a “failure . . . to pay or provide the benefits allegedly due under any contract relating to employee benefit programs.” This interpretation is certainly plausible. However, if the court were to accept Liberty’s interpretation, the exclusion would operate to eviscerate the coverage that the EBLI provision provides where any error or omission in the “administration” of the benefits program involved an alleged breach of contract. Wyman’s interpretation of this provision is that it operates only to exclude claims based on decisions about what medical treatment a particular employee benefits holder would be entitled to from a third-party health care provider. This interpretation is supported by the deposition testimony of a Liberty claims handler, who agreed that this is a plausible interpretation. The court concludes that the parole evidence offered by Wyman demonstrates that this exclusion is latently ambiguous. Exclusions in insurance contracts are to be strictly construed against the insurer where ambiguous. Id. This ambiguity is resolved against Liberty and in favor of Wyman. Id.
3. Personal Injury “Hurt Feelings” Coverage:
Wyman has also sought coverage for the defense of the Massachusetts suit under the “personal injury” provision of the policy, supra, on the grounds that this provision covers third-party claims seeking damages for “injury to feelings.” Unlike the Michigan suit, which clearly stated a claim for emotional distress damages, neither the original nor the amended complaint in the Massachusetts suit can be read to be reasonably susceptible to an interpretation that they state a claim for “hurt feelings” damages as described in the policy.[2] The mere fact that the Michigan suit adequately stated a covered claim for emotional distress damages is of no relevance to whether the Massachusetts suit adequately stated such a claim. The court agrees with Liberty that the words “irreparable injury,” as used in the complaint in the Massachusetts suit, cannot be reasonably construed to suggest a claim for “hurt feelings.” Therefore, on the specific issue of whether Liberty had a duty to defend Wyman in the Massachusetts suit on the basis of coverage arising from the personal injury provision and amendatory endorsement, Liberty’s motion for summary judgment must be allowed.
III. Coverage of Pre-Tender Defense Costs:
As to the Michigan suit only, Liberty argues that it is not obligated to pay the approximately $200,000.00 in defense costs that Wyman incurred in defense of that suit between the time the suit was filed in April 1993, and December 15, 1993, when Liberty was given formal notice of the claims. Liberty’s argument derives from two sources within the policy. The first is the provision requiring Wyman to notify Liberty in the event of suit, supra, and the second is the provision prohibiting Wyman from voluntarily making payments or incurring expenses without Liberty’s consent.
Untimely notice by an insured to its insurer is not an absolute bar to any duty of the insured to defend an underlying claim; rather, Massachusetts courts have followed the trend to “eschew such technical forfeitures . . . unless the insurer has been materially prejudiced by virtue of late notification.” Johnson Controls, Inc. v. Bowes, 381 Mass. 278, 280 (1980); See also Darcy v. Hartford Ins. Co., 407 Mass. 481, 484-87 (1990). The insurer seeking to avoid liability must carry the burden of showing both that the policy notice provision at issue was breached and that this breach resulted in prejudice to its position. Id., at 282.
As to whether an insurer is relieved of liability for costs which are voluntarily assumed by the insured without the insurer’s consent, the focus for the court is whether the breach of such provision deprived the insurer of meaningful opportunity to protect its interests. See Augat v. Liberty Mutual Ins. Co., 410 Mass. 117, 123 (1991).
The undisputed facts demonstrate that Liberty has met its threshold burden of showing that Wyman breached the notice provision of its policy. Liberty, however, makes no argument that it suffered actual prejudice as a result of late notice. Rather, it characterizes the Johnson holding and progeny as having application only to whether an insurer has a duty to defend an underlying suit as a whole, and not to whether an insurer has a duty to indemnify an insured for defense costs incurred prior to notice. Wyman, conversely, asserts that a showing of prejudice is required even where the only issue concerns pre-no-tice defense costs. Alternatively, Wyman argues that Liberty either waived its right to effective notice or is estopped from raising untimely notice as a defense.
Liberty relies on Hoppy’s Oil Serv., Inc. v. Ins. Co. of N. Am., 783 F.Supp. 1505 (D.Mass. 1992), for the proposition that there is no duty on the part of an insured to pay for pre-notice defense costs regardless of prejudice. The court does not find Hoppy's persuasive in the disposition of the case at bar because there, the court based its holding largely on a finding of prejudice to the insured from late notice as the result of lost evidence. Id., at 1510. Furthermore, in so far as Liberty rests its defense on a breach of the voluntary payment provision, there is no showing whatsoever that the expenses and defense Wyman undertook between April and December of 1993 deprived Liberty of its ability to protect its interests. Although the cases considering voluntary payment provisions do suggest that the need to show prejudice is sometimes relieved by the actions of the insured in handling the underlying suit for which coverage is sought, those cases involved suits that the insured had settled prior to consent from the insurer. See e.g. Atlas Tack Corp. v. Liberty Mutual Ins. Co., 48 Mass.App.Ct. 378, 383 *775 (1999). Here, Liberty has offered no facts to suggest that it was not able to protect its interests.
Because Liberty has advanced no reason supported by admissible evidence as to whether it was prejudiced by late notice in regard to legal defense costs incurred by Wyman before notice was tendered, and given that it carries the burden of showing so, summary judgment for Wyman on this issue must also be allowed.
IV. The Duty to Indemnify:
Liberty further argues that because there was no duty to defend the Massachusetts suit, and no duty to pay for pre-tender defense costs in the Michigan suit, there is presently no duty to indemnify Wyman for the “damages” it has incurred as a result of the costs incurred and settlements in both suits. Specifically, Liberty asserts that each item accounted for in the settlements, listed in the facts above, was not covered by the policy. The only question is whether these items are “damages” which Wyman became legally obligated to pay. The court concludes that they are.
The court fails to see any merit in Liberty’s arguments here, which essentially repeat why no coverage should be afforded for Wyman’s actions here. The fact that the settlement payments accounted for benefits to the underlying plaintiffs does not remove such payments from the meaning of “damages” as used in the EBLI endorsement. Although Wyman may have experienced a net gain by means of reducing total retiree benefits below the level that was provided before the December 28, 1992 announcement, that fact is not material to the issue of whether Wyman became legally obligated to pay as a result of errors in the administration of its benefits program.
Furthermore, attorneys fees are certainly covered under the policy. First, to the extent that the underlying suits were couched as ERISA claims, such claims would entitle the underlying plaintiff classes to recover reasonable attorney fees. See 29 U.S.C. §l-132(g)(l); Doe v. Traveler’s Ins. Co., 167 F.3d 53, 61 (1st. Cir. 1999). Second, the term “damages” has not been read literally by Massachusetts courts construing whether particular payments are covered as such. See e.g. Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 700 (1990) (environmental response costs imposed on the basis of equitable principles falls within the meaning of “damages”).
ORDER
For the foregoing reasons, the plaintiff Wyman’s motion for summary judgment as to liability only is ALLOWED; the defendant Liberty’s motion for summary judgment is ALLOWED IN PART, only in regard to the court’s ruling that the policy’s personal injury provision did not give rise either to a duty to defend or a duty to indemnify Wyman in connection with the Massachusetts suit. In all other respects, Liberty’s motion is DENIED.

The court notes that Liberty’s additional contention that the settlement of the two underlying suits resulted in a net gain for Wyman is irrelevant in determining whether there was a duty to defend those suits under the policy.

In light of this conclusion it is unnecessary to decide whether, at the time the Massachusetts suit was filed, emotional distress damages would be allowed in a suit essentially sounding in contract. Only if the Massachusetts suit were reasonably susceptible to the interpretation that such a claim was advanced would such analysis be necessary.